******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

ECKER, J., with whom McDONALD and D'AURIA, Js., join, dissenting. The defendant, Quavon Torres, was convicted of murder in violation of General Statutes § 53a-54a (a) and carrying a pistol without a permit in violation of General Statutes § 29-35 following a jury trial at which evidence central to his third-party culpability defense improperly was excluded. In light of the importance of the excluded evidence to the defendant's theory of the case, the lack of physical evidence implicating the defendant in the charged crimes, and the contradictory and inconsistent evidence adduced at trial, I conclude that the evidentiary error was harmful. Because I would reverse the judgment of conviction and remand the case for a new trial, I respectfully dissent.[1]

The majority opinion accurately sets forth the relevant facts and procedural history, but the following facts warrant particular emphasis. There was no physical evidence, such as DNA or fingerprint evidence, linking the defendant to the murder or the murder weapon, and, although there were eyewitnesses to the shooting, none of the eyewitnesses testified at trial that the defendant was the perpetrator of the charged crimes. Indeed, at trial, none of the state's witnesses implicated the defendant in either the commission of the murder or possession of the murder weapon; their inculpatory version of events came in the form of prior inconsistent statements introduced into evidence under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), thus requiring the jury to choose between conflicting accounts of events. The state's case, in short, depended on the credibility of the witnesses and, in particular, the reasons for various changes in those witnesses' versions of events over time.

At trial, the fundamental question for the jury was the identity of the individual who had shot and killed the victim, Donald Bradley. The state claimed that the defendant was the shooter, but the defendant raised a third-party culpability defense, arguing that Freddy Pickette was the guilty party. According to the defendant's theory of the case, Pickette shot and killed the victim and brought the gun back to 543 Orchard Street in New Haven after he fled the scene. The trial court considered the defendant's third-party culpability defense, supported by the testimony of his cousin, Tasia Milton,[2] to be strong enough to warrant submission to the jury.

Milton testified at trial that she was sitting outside of 543 Orchard Street when she heard gunshots and saw the defendant and Marcus Lloyd running toward her with "[Pickette] a little behind them." Although Pickette did not enter the building, he ran by 543 Orchard Street and tossed a gun to Lloyd. The defendant

and Lloyd entered the building and ran up to the third floor apartment in which they and Pickette had been socializing together earlier in the evening. Milton testified that she had "never seen [the defendant] with the gun" but that she saw Pickette with the gun earlier that day.

Milton's trial testimony was inconsistent in part with her statement to the police on the night of the murder, as well as her testimony at the defendant's first trial.[3] On the night of the murder, Milton reported to the police that, after hearing gunshots, she fled upstairs to the third floor apartment of 543 Orchard Street, quickly followed by the defendant and Lloyd. According to Milton's statement to the police, Pickette did not return to the apartment after the shooting. She stated that the defendant gave his sister, Amber Torres, a black gun with a wooden handle and told her to "do something with [it]." Milton testified at the defendant's first trial substantially in conformance with these statements.[4]

At the defendant's second trial, the state introduced Milton's prior inconsistent statement to the police and trial testimony as substantive evidence of the defendant's guilt and to undermine Milton's credibility, which was central to the defendant's third-party culpability defense. The state pointed out that Milton had not previously informed the police or testified that Pickette tossed the gun to Lloyd following the shooting, contrary to her testimony at the defendant's second trial. The defendant sought to rehabilitate Milton's credibility and to bolster his third-party culpability defense by eliciting testimony from Milton that, when she gave her statement to the police, she was young, "high," "nervous," and felt "pressured by the cops . . . ." Additionally, Milton testified that she did not mention Pickette's possession of the gun at the defendant's first trial because "[Pickette had] threatened [her] in the [courthouse] hallway, saying [that] he was going to have someone come beat [her] ass."

The evidentiary issue at the center of the present appeal arises because, although the defendant was permitted to adduce evidence of Pickette's threat to Milton, he was precluded from presenting evidence that she also had been physically assaulted by Pickette's sister two days later, consistent with the threat made by Pickette and his compatriot. The state moved to preclude the evidence of the physical assault on the grounds that it was irrelevant, inadmissible hearsay, inadmissible character evidence, and unduly prejudicial. Defense counsel opposed the state's motion, arguing that the physical assault of Milton was "relevant and [went] to [Milton's] motive, interest, [and] bias . . . to lie [at the first trial]."

Milton testified as follows outside the presence of the jury in response to the trial court's request for an offer of proof: Just prior to the defendant's first trial,

Milton encountered Pickette and a female witness in the hallway of the courthouse. An argument ensued, during which Pickette called Milton a "snitch" and said that "they were going to whip [her ass]" if she testified. The female witness said to Pickette, "don't argue with [Milton], you have a sister named Ash Black . . . ." Two days later, Pickette's sister, Ashley Black, and two other individuals "jumped" and "beat on" Milton in the Fair Haven section of New Haven. During the assault, Milton's assailants told her that she "should mind [her own] business" and mentioned "something about [Pickette] . . . ." Both events occurred days before Milton was called to testify at the defendant's first trial.

Following the offer of proof, the trial court ruled that Pickette's threats to Milton in the courthouse were relevant and admissible, but the physical assault of Milton in Fair Haven was not. The trial court reasoned that Pickette was involved in the argument but was not involved in the assault and that the connection between Milton's trial testimony and the assault was "far too speculative. . . . The witness . . . Milton, just indicated that one of these individuals said to her, 'mind your own business.' Nothing that's attributed to this case. That could be mind your own business concerning a domestic with [a] boyfriend, [a] girlfriend. Far too speculative, so it's not relevant evidence for this jury to hear." As a result, the defendant was prohibited at his second trial from rehabilitating Milton's credibility and bolstering his third-party culpability defense by presenting evidence that Milton had been assaulted by Pickette's sister shortly before Milton testified at the defendant's first trial.

The defendant claims on appeal that the trial court improperly excluded evidence of the assault because it was "relevant and material to the defendant's third-party culpability [defense] that Pickette was the shooter," as well as to Milton's "motive not to implicate Pickette during the defendant's first . . . trial and . . . to rehabilitate her credibility at the defendant's second trial, and explain why she did not previously implicate Pickette." The defendant further contends that the evidentiary error was harmful because Milton's testimony was the "strongest evidence in support of his third-party culpability claim." I agree.

The trial court indisputably has wide discretion to determine the relevancy of evidence, and, under the abuse of discretion standard, every reasonable presumption must be made in favor of upholding the court's ruling. See, e.g., *State* v. *Best*, 337 Conn. 312, 318, 253 A.3d 458 (2020). That said, it is axiomatic that relevant evidence is admissible unless "otherwise provided by the constitution of the United States, the constitution of the state of Connecticut, the [Connecticut] Code [of Evidence], the General Statutes or the common law." Conn. Code Evid. § 4-2. This rule reflects a cornerstone

principle of evidence law.[5]

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence." (Internal quotation marks omitted.) *State* v. *Best*, supra, 337 Conn. 317; see Conn. Code Evid. § 4-1. To be relevant, evidence need not be conclusive or even compelling. See, e.g., E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 4.1.4, p. 146 ("[a] party is not required to offer such proof of a fact that it excludes all other hypotheses"). "All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 429, 64 A.3d 91 (2013).

It is well established that third-party culpability evidence is relevant if there is "a direct connection between a third party and the charged offense . . . ." (Internal quotation marks omitted.) *State* v. *Baltas*, 311 Conn. 786, 810, 91 A.3d 384 (2014). "Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination." (Internal quotation marks omitted.) Id., 811. In the present case, it is undisputed that there was a direct connection between Pickette and the charged crimes in light of Milton's testimony that Pickette ran by 543 Orchard Street and tossed Lloyd the gun used to murder the victim. Indeed, the defense theory was sufficiently strong that the trial court instructed the jury regarding the defendant's claim that a "third party . . . Pickette, may be responsible for the crimes the defendant is charged with committing . . . ."[6] See, e.g., *State* v. *Arroyo*, 284 Conn. 597, 610, 935 A.2d 975 (2007) (holding that defendant was entitled to third-party culpability instruction only "if the evidence pointing to a third party's culpability, taken together and considered in the light most favorable to the defendant, establishes a direct connection between the third party and the charged offense, rather than merely raising a bare suspicion that another could have committed the crime").

The direct connection between Pickette and the charged crimes does not resolve the evidentiary issue, however, because "[t]he general rule is that threats [or assaults] against witnesses are not relevant and are thus inadmissible as evidence . . . ."[7] *State* v. *Walker*, 214 Conn. 122, 129, 571 A.2d 686 (1990). *Walker* also delineated two exceptions to this general rule. See id., 129–30. First, evidence of threats or assaults against a witness is relevant and admissible if the defendant is linked in some way to the making of the threats or assaults. "[E]vidence of threats [or assaults] against witnesses

is generally admissible either on the theory that such conduct is inconsistent with the defendant's claim of innocence or on the theory that the making of such threats [or assaults] evinces a consciousness of guilt. . . . Obviously, if the threats [or assaults] cannot be linked to the defendant, evidence of such [conduct] directed toward a witness would be of no probative value for those purposes." (Citations omitted.) Id., 129. Second, such evidence is relevant and admissible, regardless of the connection to the defendant, to explain a witness' prior inconsistent statements and to rehabilitate the witness' credibility. "A witness who has been impeached by the admission of a prior inconsistent statement is generally entitled to explain such contradictory statement. . . . Pursuant to the rule permitting explanations of prior inconsistent statements, it is generally held that evidence of threats [or assaults] to a witness or fear on the part of a witness, in order to explain an inconsistency, is admissible in criminal cases for credibility rehabilitation purposes even if the [conduct] or fear [has] not been linked to the defendant [or the allegedly culpable third party]." (Citations omitted; internal quotation marks omitted.) Id., 130.

Both *Walker* exceptions apply in the present case. *Walker* articulated the first exception in the context of threats against a witness allegedly attributable to the defendant in that case; see id., 128, 131; but it applies equally when the threats or assaults are allegedly attributable to an individual who is the subject of a defendant's third-party culpability defense. Thus, once it has been established that there is a direct connection between the allegedly culpable third party and the crimes charged and that there is a link between the allegedly culpable third party and the threats or assaults on a witness, such evidence is relevant to a defendant's third-party culpability defense.

The evidence was more than sufficient to establish a clear link between Pickette and the assault. The record reflects that, prior to the defendant's first trial, while Milton was waiting in the courthouse hallway in connection with the present case, Pickette called her a "snitch," and he and another witness threatened "to whip [her ass]" if she testified. The other witness told Pickette not to "argue with [Milton]" because he has "a sister named Ash Black . . . ." Two days later, Milton was assaulted by three individuals, one of whom was Pickette's sister, Ashley Black. During the assault, Milton's assailants told her to "mind [her own] business" and mentioned "something about [Pickette] . . . ." Given the temporal proximity between the threats and the assault, and the facts that Pickette's sister was one of the assailants and that Pickette was mentioned during the assault, it is entirely reasonable for the defendant to posit to the jury the inference that Pickette carried out his threat "to whip [Milton's ass]" by sending his sister to assault Milton prior to her testimony at the

defendant's first trial. See, e.g., *State* v. *Robertson*, 254 Conn. 739, 756–57, 760 A.2d 82 (2000) (evidence was sufficient to link defendant to threats against witness because defendant stated in recorded conversation that "someone 'need[s]' to talk to [the witness who was threatened] 'some more' "); *State* v. *Taft*, 25 Conn. App. 578, 584–85, 595 A.2d 918 (evidence was sufficient to link defendant to threats against witness because, one day before trial, witness was approached by two men who shoved him "against his car and said, 'we have a message from [the defendant], don't show up tomorrow' "), cert. denied, 220 Conn. 921, 598 A.2d 144 (1991). Far from being speculative, Pickette's connection to the assault seems likely on this record. Accordingly, the assault of Milton was relevant and admissible to demonstrate Pickette's culpability in the commission of the charged crimes and his consciousness of guilt.

Even in the absence of a link between Pickette and the assault, the evidence also was admissible under the second exception set forth in *Walker* because it was relevant to explain Milton's prior inconsistent statement and to rehabilitate her credibility. See *State* v. *Walker*, supra, 214 Conn. 130. The fact that Milton was assaulted by Pickette's sister just days before Milton's testimony at the defendant's first trial was probative of Milton's state of mind at the time she testified at that trial. This evidence supports a reasonable inference that Milton had a motive to avoid implicating Pickette in the commission of the crimes charged by testifying falsely at the first trial. See, e.g., *State* v. *Alvarez*, 216 Conn. 301, 320, 579 A.2d 515 (1990) (evidence of witness' fear was admissible "to show that [the witness] was afraid and therefore had a motive to testify falsely"); *State* v. *Walker*, supra, 214 Conn. 131 (evidence of threats against witness was admissible and "relevant to show [the witness'] state of mind"); *State* v. *Talton*, 63 Conn. App. 851, 855–57, 779 A.2d 166 (evidence that witness feared retaliation for identifying defendant properly was admitted into evidence to explain witness' prior inconsistent statement and to rehabilitate witness' credibility), cert. denied, 258 Conn. 907, 782 A.2d 1250 (2001). For the same reason, evidence of the assault was relevant and admissible to rehabilitate Milton's inconsistent testimony during the second trial that it was Pickette, rather than the defendant, who possessed the murder weapon after the shooting. The defendant was entitled to argue that her testimony changed because the fear caused by the assault prior to the first trial had dissipated by the time of the second trial, and, accordingly, contrary to the state's contention, her testimony at the second trial was more credible. I therefore conclude that the trial court abused its discretion in excluding evidence of the assault.

I disagree with the majority that the error was harmless because, in my view, the defendant has met his burden of demonstrating harm.[8] See part I B of the

majority opinion. "[W]hether [an improper ruling] is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the [defendant's] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Fernando V.*, 331 Conn. 201, 215, 202 A.3d 350 (2019). Although the question is a close one, after considering the foregoing factors and the trial as a whole, I am persuaded that the evidentiary error affected the jury's verdict on this record.

Milton's testimony was essential to the defendant's third-party culpability defense that it was Pickette who murdered the victim and brought the gun back to 543 Orchard Street. As I previously explained, the central issue in the case was the identity of the perpetrator; Milton's testimony, which placed the murder weapon in Pickette's hands immediately after the shooting, was persuasive evidence of Pickette's guilt, and she was the only witness who connected the gun to Pickette. Milton was thus a critical witness in support of the defendant's third-party culpability defense, and her credibility and motive to testify falsely at the defendant's first trial were crucial issues to be resolved by the jury. The fact that Milton had been physically assaulted by Pickette's sister just days before she testified at the defendant's first trial, consistent with Pickette's earlier threat "to whip [her ass]" if she testified, would have illustrated to the jury the extent of Milton's motive to testify falsely at the first trial to avoid implicating Pickette. Because this evidence was vital to the jury's assessment of Milton's credibility, the defendant's third-party culpability defense, and the pivotal issue of identity, I believe that its improper exclusion was harmful.[9] See, e.g., *State* v. *Fernando V.*, supra, 331 Conn. 223–24 ("[when] credibility is an issue and, thus, the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a [witness'] credibility is not harmless error" (internal quotation marks omitted)); *State* v. *Cerreta*, 260 Conn. 251, 265, 796 A.2d 1176 (2002) (improper exclusion of third-party hair and fingerprint evidence was not harmless because it "would have given credence to the defendant's claim of innocence"); *State* v. *Colton*, 227 Conn. 231, 254, 630 A.2d 577 (1993) ("[t]he

exclusion of evidence bearing on the motivation of a chief witness for the state, particularly when no other evidence corroborated material aspects of the witness' testimony, is harmful error"); *State* v. *Rinaldi*, 220 Conn. 345, 357–58, 599 A.2d 1 (1991) (improper exclusion of evidence central to defendant's defense that he was not source of semen found in sexual assault victim was not harmless error).

The state's case against the defendant was not particularly strong. The eyewitnesses to the murder provided conflicting accounts as to the details surrounding the shooting and the identifying characteristics of the shooter. Lachell Hall, Pickette's aunt,[10] testified that she saw Pickette sitting in the front passenger seat of the victim's vehicle as it drove through the Burger King drive-through lane. Hall saw the car stop and the victim exit the driver's seat, walk around the back of the vehicle, and reach for something inside. She also saw a black man wearing a black or dark colored shirt exit the rear passenger seat on the driver's side of the vehicle. Hall heard three to four gunshots, but she did not see a gun and could not tell from what direction the gunshots were fired. Hall did not see the shooter and could not identify the passenger in the rear of the vehicle.

Teresa Jones also witnessed the shooting. Jones was exiting the supermarket across the street from the Burger King when she saw "some guys standing around a car" talking in the Burger King drive-through lane. One of the men, who was standing near the trunk of the vehicle wearing a "Canadian blue" shirt and blue jeans, pulled out a silver gun and shot into the car approximately five times. Immediately afterward, the shooter and an individual wearing a red shirt ran in the direction of Orchard Street. When Jones later viewed a photographic array prepared by the police, she was unable to identify the defendant as one of the men involved in the shooting. Jones did identify Pickette, whom she referred to as Freddy Morrison,[11] as one of the men standing around the victim's vehicle prior to the shooting. Jones informed the police that the shooter looked like Freddy Morrison but was not Freddy Morrison.

The testimony of Hall and Jones differed in certain critical respects.[12] According to Hall, someone wearing a black or dark colored shirt exited the rear passenger seat of the victim's vehicle immediately prior to the shooting,[13] but, according to Jones, the shooter was standing outside of the car talking with other individuals immediately prior to the shooting. Hall testified that Pickette was seated in the front passenger seat of the car when the shooting occurred, but Jones testified that he was standing outside of the vehicle. Hall testified that the occupant of the rear passenger seat was wearing a black or dark colored shirt, but Jones testified that the

shooter was wearing a Canadian blue shirt. Furthermore, Jones testified that the murder weapon was silver, whereas the undisputed evidence adduced at trial established that the murder weapon was black with a wooden handle. Neither Hall nor Jones was able to identify the defendant as the individual who had shot and killed the victim.

Thus, we have a crime with no direct or uncontroverted evidence to establish the shooter's identity. The defendant's DNA and fingerprints were not found on the gun used to commit the murder, and the video evidence does not show who shot the victim. There were multiple eyewitnesses, but none of them alone provided a comprehensive account of the shooting.[14] None of the eyewitnesses, moreover, testified that the defendant was the perpetrator of the charged crimes. All of the relevant witnesses gave testimony that materially conflicted with either the testimony of another witness or their own prior testimony. And most of the witnesses either had a direct interest in the outcome as potential suspects (Pickette and Lloyd), or were related to the defendant or Pickette. See footnote 2 of this opinion. As a result, this was a case in which every significant piece of evidence relevant to witness credibility, the identity of the shooter, and the defendant's third-party culpability defense was important to the jury's verdict.

I do not dispute that the majority pieces together a version of the varying witness accounts to create a sufficient evidentiary basis to support the defendant's conviction, but the legal sufficiency of the evidence is not the issue, and the majority's marshaling of evidence sufficient to support the conviction misapprehends the point of harmless error analysis. "Legal sufficiency of the evidence is not the test for harmless error even if only a nonconstitutional error is involved. The harmlessness of an error depends [on] its impact on the trier and the result"; *State* v. *Bruno*, 197 Conn. 326, 336, 497 A.2d 758 (1985) (*Shea, J.*, concurring), cert. denied, 475 U.S. 1119, 106 S. Ct. 1635, 90 L. Ed. 2d 181 (1986); not on whether the evidence, when viewed in the light most favorable to the jury's verdict, was sufficient to support an inference of guilt.

To ascertain the impact that the excluded evidence would have had on the jury, it is important to focus on the quality of the state's evidence. Although there was significant testimony from multiple sources implicating the defendant, the persuasive force of every inculpatory statement was weakened by a countervailing, contradictory, or conflicting statement, usually from the same witness. For example, during Pickette's and Lloyd's testimony at the defendant's trial, neither implicated the defendant in the commission of the charged crimes, although they previously had identified him as the shooter.[15] Similarly, the defendant's sister, Amber Tor-

res, testified that she was unable to remember anything about the day of the murder, but her prior inconsistent statement that she found a gun in the apartment after the shooting was admitted into evidence under *Whelan*.[16] The case against the defendant was built on a patchwork of facts and inferences derived from the inconsistent testimony of numerous witnesses; no single piece of evidence carried dispositive force, and the addition of Milton's excluded testimony to the mosaic may well have substantially swayed the jury's verdict.

Lastly, the fact that Milton failed to implicate Pickette in her initial statements to the police in no way renders the evidentiary error harmless. Milton, like many witnesses, including Pickette, Lloyd, and Amber Torres,[17] gave in-court testimony that differed significantly from a prior recitation of events. She candidly acknowledged that she lied to the police in 2012, but testified that she did so because she was young, "high," "nervous," and felt "pressured by the cops . . . ." It was up to the jury to sift through these shifting narratives and to decide what portion, if any, of these witnesses' testimony and prior statements were worthy of belief. To perform the essential function of assessing the believability of Milton's testimony, on which the defendant's third-party culpability defense largely depended, the jury needed all of the information pertinent to Milton's credibility, including evidence of Milton's assault prior to the defendant's first jury trial. See *State* v. *Fernando V.*, supra, 331 Conn. 223 ("[i]t cannot be harmless error to remove from the fact finder the very tools by which to make a credibility determination" (internal quotation marks omitted)); see also *State* v. *Morgan*, 274 Conn. 790, 800, 877 A.2d 739 (2005) ("because the jury has the opportunity to observe the conduct, demeanor and attitude of the witnesses and to gauge their credibility, [i]t is axiomatic that evidentiary inconsistencies are for the jury to resolve, and it is within the province of the jury to believe all or only part of a witness' testimony" (internal quotation marks omitted)).

In light of the conflicting and contradictory statements by the state's witnesses and the lack of physical evidence, I conclude that the improper exclusion of evidence of Milton's assault was harmful to the defendant's third-party culpability defense and that a new trial is required. Accordingly, I dissent.

[1] I see no need to reach the defendant's prosecutorial impropriety claims. To the extent that the defendant's claim regarding the exclusion of evidence of Teresa Jones' specific acts of misconduct would be likely to arise on remand, I agree with the majority that a trial court has broad discretion to exclude such evidence on the basis of its remoteness in time. See part II of the majority opinion.

[2] Milton was not the only witness with a familial relationship to the defendant or Pickette. Amber Torres, who testified on behalf of the state, is the defendant's sister. Additionally, the two eyewitnesses to the shooting, Lachell Hall and Teresa Jones, both are related to Pickette. Hall is Pickette's aunt; see footnote 10 of this opinion; and Jones testified that she had known Pickette "since he was a child" because her "nephew is his brother."

[3] The defendant was convicted at the first trial of murder and carrying a pistol without a permit. On appeal, the Appellate Court reversed the defen-

dant's conviction and remanded the case for a new trial. See *State* v. *Torres*, 175 Conn. App. 138, 154, 167 A.3d 365 (2017) (reversing defendant's conviction because witness made suggestive in-court identification, contrary to *State* v. *Dickson*, 322 Conn. 410, 453, 141 A.3d 810 (2016), cert. denied, U.S. , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017)), cert. denied, 327 Conn. 958, 172 A.3d 204 (2017), cert. denied, U.S. , 138 S. Ct. 1303, 200 L. Ed. 2d 474 (2018).

[4] Although Milton denied seeing the defendant or anyone else holding a gun, she testified at the first trial that she heard reference to it when the defendant and Lloyd returned to the third floor apartment at 543 Orchard Street following the shooting and the defendant told Amber Torres to "just do something" with the gun. Consistent with her prior statement to the police, Milton testified at the first trial that Pickette never returned to the apartment.

[5] See, e.g., *Curtis* v. *Bradley*, 65 Conn. 99, 109, 31 A. 591 (1894) ("[b]eing relevant, [the evidence] must be admitted, unless excluded under some legal principle, or rule of public policy, which forbids the admission of certain classes of evidence, no matter how relevant and material"); see also E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 4.1.4, pp. 145–46.

[6] The trial court instructed the jury: "There has been evidence that a third party, not the defendant, committed the crimes for which the defendant is charged. This evidence is not intended to prove the guilt of the third party but is part of the total evidence for you to consider. The burden remains on the state to prove each and every element of the offense beyond a reasonable doubt. It is up to you and to you alone to determine whether any of this evidence, if believed, tends to directly connect a third party to the crimes with which the defendant is charged. If, after a full and fair consideration and comparison of all the evidence, you have left in your mind reasonable doubt indicating that the alleged third party . . . Pickette, may be responsible for the crimes the defendant is charged with committing, then it would be your duty to render a verdict of not guilty as to the [defendant]."

[7] Although *Walker* involved verbal threats against a witness rather than a physical assault, the parties do not dispute that the principles elucidated in *Walker* are applicable to this case.

[8] Because the defendant has fulfilled his burden of demonstrating harm, I see no need to address whether the evidentiary error rose to the level of a constitutional violation. Accordingly, I express no opinion on the conclusions reached in part I A of the majority opinion.

[9] The majority suggests that the exclusion of the assault of Milton was harmless because "it is just as plausible that Pickette was trying to prevent Milton from implicating the defendant," and, therefore, Pickette's threatening and assaultive conduct may have been intended to protect the defendant, rather than Pickette himself. Footnote 8 of the majority opinion. The state does not rely on the explanation now offered by the majority, and for good reason. On the night of the shooting, Pickette exculpated himself in the charged crimes by telling the police that the defendant had shot the victim, and, therefore, I find Pickette's alleged charitable motive to be dubious at best.

To support its plausibility argument, the majority relies on Pickette's testimony at the defendant's first and second trials, in which Pickette declined to identify the defendant as the shooter, as well as Milton's testimony during the offer of proof that, when she was threatened in the courthouse hallway, "she viewed herself as being in 'the same predicament' as Pickette, namely, being called to testify against the defendant." Footnote 8 of the majority opinion. The majority's reliance on Pickette's testimony at the defendant's first trial and Milton's testimony during the offer of proof (which occurred outside the presence of the jury) is misplaced because this testimony was not admitted into evidence for the jury's consideration. In conducting a harmless error analysis, "we must examine the impact of the . . . [excluded] evidence on *the trier of fact and the result of the trial*"; (emphasis added; internal quotation marks omitted) *State* v. *Fernando V.*, supra, 331 Conn. 215; in light of the evidence properly before the jury. See *State* v. *Thompson*, 305 Conn. 806, 823 n.16, 48 A.3d 640 (2012) ("[harmless error] review must be confined to the record"). The jury was unaware of Pickette's testimony at the defendant's first trial or Milton's testimony during the offer of proof, and I fail to see how the jury could have drawn any inferences, plausible or otherwise, on the basis of testimony it never heard.

[10] Hall testified that she had known Pickette "[s]ince he was a kid" and

that she "claim[s] him as [her] nephew" because her "brother [has] kids with his mother . . . ."

[11] Pickette testified that his grandfather's last name is Morrison.

[12] A third witness, Dominique Padilla, also testified at the defendant's trial. Padilla did not witness the shooting but testified that she heard three to four gunshots from the direction of Burger King as she was exiting the parking lot of a nearby McDonald's. Afterward, she saw two dark skinned kids run by, one wearing a red shirt and the other a blue shirt. Padilla was unable to identify the defendant, Pickette, or Lloyd as the individuals she saw running away from Burger King that night.

[13] In my view, Hall's testimony about the initial positions of the defendant, Pickette, and Lloyd in the victim's vehicle was not corroborated by footage from a security camera located outside of a nearby CVS Pharmacy. Given the poor quality of the footage and the fact that both the rear driver's side and front passenger's side occupants were wearing dark colored shirts, it is difficult to discern in the footagewhich individual is the defendant and which is Pickette. The most that can be said of the footage is that it supports a reasonable inference that either the defendant or Pickette was seated in the rear passenger seat of the vehicle prior to the victim's murder.

[14] The majority states that "it is a rare case in which the jury is provided with direct testimony from a witness who is able to give a comprehensive, detailed account of all of the events surrounding a murder." Footnote 7 of the majority opinion. This observation misses the point. The majority's focus on the importance of the eyewitness testimony and its conclusion that this testimony is more "probative with respect to the identity of the shooter" than Milton's testimony requires a critical assessment of the strength of the state's eyewitness evidence. Part I B of the majority opinion. The present case involved eyewitness testimony that was conflicting and, at times, contradicted by the undisputed evidence in the record. The inconsistent nature of the eyewitness testimony undermines the overall strength of the state's case and casts doubt on the majority's reliance on this selective evidence to conclude that the evidentiary error was harmless.

[15] Pickette testified that he did not see a gun, did not see the defendant get out of the vehicle, and did not see who shot the victim. Pickette's prior inconsistent statement to the police that the defendant exited the vehicle and shot the victim with a black gun was admitted into evidence under *State* v. *Whelan*, supra, 200 Conn. 753.

Lloyd testified that he did not remember the murder because it was years ago and he was on drugs at the time. Lloyd's prior inconsistent statement to the police, in which he informed the police that the defendant had a gun, had exited the vehicle after the victim got out, and later had given the gun to Amber Torres after they fled to Orchard Street, was admitted into evidence under *Whelan*.

[16] Amber Torres informed the police that, after the shooting, she found a gun lying on the couch in the back bedroom of the third floor apartment and that she used a washcloth to move the gun to a black bag.

[17] See footnotes 15 and 16 of this opinion.